1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DeVAUGHN LEE IVY,                        No. 2:14-cv-1967-JAM-EFB P (TEMP)

12                    Petitioner,

13        v.

14   WILLIAM MUNIZ, Warden,                   FINDINGS AND RECOMMENDATIONS

15                    Respondent.

16

17        Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on April 30, 2012, in the San Joaquin County Superior Court on charges of

20   three counts of premeditated attempted murder, one count of shooting at an occupied vehicle,

21   three counts of assault with a semi-automatic firearm, and one count of causing corporal injury to

22   a child, with several firearm and great bodily injury enhancement allegations found to be true.  He

23   seeks federal habeas relief on the following grounds: (1) the evidence introduced at his trial was

24   insufficient to support his conviction on two of the counts against him; (2) his trial counsel

25   rendered ineffective assistance; and (3) the trial judge violated his federal constitutional rights in

26   responding to a question from the jury.  Upon careful consideration of the record and the

27   applicable law, and for the reasons set forth below, the application for habeas corpus relief must

28   be denied.

                                                1

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendant DeVaughn Lee Ivy fired multiple rounds from a semi-automatic SKS rifle at rival gang member Antoneyo Robinson, who was standing in front of a liquor store in Stockton. Robinson's girlfriend, Bretina Moore, was standing next to her car across the street when defendant opened fire. Their infant son, Jayshawn, was seated in a car seat in the back of the vehicle. Robinson ran for the car. Moore, now in the driver's seat, waited for Robinson to get inside and then drove away at a high rate of speed. Defendant got into a car driven by another man and followed, firing at least 11 additional rounds into the back of Moore's car before abandoning the pursuit. A bullet fragment struck Jayshawn in the back of the head and lodged beneath the skin. Fortunately, the fragment had slowed considerably due to its impact with the car and did not cause a fatal injury.
>
> Convicted by jury of three counts of premeditated attempted murder (Counts 1–3), one count of shooting at an occupied vehicle (Count 4), three counts of assault with a semi-automatic firearm (Counts 5–7), and one count of causing corporal injury to a child (Count 8), with various firearm and great bodily injury enhancement allegations found to be true, defendant was sentenced to serve an indeterminate term of 25 years to life, plus three consecutive life terms, plus a consecutive determinate term of 13 years 4 months in state prison. On appeal, defendant contends: (1) the evidence is insufficient to support his convictions for the attempted murders of Moore and Jayshawn (Counts 2 and 3); (2) defendant's trial counsel rendered constitutionally deficient assistance by (a) failing to object to certain statements made by the prosecutor during closing argument concerning the concurrent intent (i.e., kill zone) theory of attempted murder, and (b) stating during the defense closing argument the SKS rifle was "an attempted murder weapon" and a kill zone was created within Moore's car during the shooting; and (3) the trial court prejudicially erred and violated his constitutional rights by telling the jury, in response to a question concerning the premeditation allegation attached to Counts 2 and 3 (i.e., "can you use that same kill zone scenario for premeditation?"), "yes, the jury can use the theory and logic of the kill zone in determining whether or not it was willful, deliberate, premeditated." We affirm. As we explain, the evidence was more than sufficient to support defendant's attempted murder convictions in Counts 2 and 3. Defense counsel's performance during his and the prosecutor's closing arguments did not fall below an objective standard of reasonableness. And the trial court's response to the jury's question did not misstate the law or violate defendant's constitutional rights.

### FACTS

Defendant and Robinson were members of rival street gangs. Defendant was a member of the Taliban Crips. Robinson was a member of the Sutter Street Crips. These rival gangs fought over who could sell drugs in certain areas of Stockton. Robinson and Michael McKinney, one of the leaders of the Sutter Street Crips, routinely sold drugs near the Cal Park liquor store, at the intersection of California Street and Park Street. At one time, defendant, Robinson, and McKinney were friends.

On January 26, 2011, around 7:00 p.m., defendant left his house on the north side of Stockton in a Honda Accord belonging to one of his roommates, Alicia Colwart. He brought with him a semi-automatic SKS rifle he kept in his room. Defendant had previously told another roommate, Michael Patrick, that he "had problems" with McKinney and needed the rifle "for protection."

About an hour later, Robinson called Moore on her cell phone and told her to meet him at Cal Park. Moore, who was at her mother's house with Jayshawn about a mile away, placed the child in a car seat in the back of her Chevy Caprice and drove to the liquor store. She parked across Park Street. Robinson was in the store's parking lot with a group of people. As Moore described, "everybody was just out there talking." One of Moore's friends, who was also in the parking lot, walked over to Moore's car and agreed to watch Jayshawn while Moore went into the store to buy a bottle of water. Robinson walked over to Moore as she crossed the street. They entered the store together, but Robinson returned to the parking lot while Moore spoke briefly with the store owner, paid for the water, and then walked back to the Caprice.

When Moore reached the driver's side door, defendant opened fire on the parking lot with the SKS rifle. He was standing outside Colwart's car on the corner of Park Street and American Street, one block east of the liquor store. From this position, defendant fired "five to seven" rounds. His intended target was Robinson, who ran to Moore's car after the shooting stopped and got in the front passenger seat. Moore, now in the driver's seat, drove away as Jayshawn cried in his car seat.

Defendant got into the passenger side of the Accord, which was being driven by another man, and followed in pursuit. They caught up with the Caprice several blocks down Park Street. "Hanging out the passenger side window," defendant fired at least 11 rounds into the back of Moore's car. Bullets struck the trunk and rear window, shattering the glass. One of the bullets fragmented upon impact with the car and struck Jayshawn in the back of the head, lodging in the muscle beneath the skin. As Moore described the chaotic scene inside the car: "First I heard like dinging, dinging, that is when I turned around and seen the lights. [Robinson] told me to go and more bullets kept coming, my back window shattered down. A bullet came through the vehicle, went – one went through my radio. As I had my foot all the way on the pedal, [Robinson] reached over and grabbed the steering wheel. I hit a garbage can at the time that

he reached over and grabbed the steering wheel, a bullet came through the back and straight through the front window.  We kept going, and once we hit the garbage can, the vehicle behind us turned off."  Moore continued down Park Street, got onto Interstate Highway 5, and drove to their house.

When they reached the house, Moore inspected Jayshawn and discovered he had been hit by one of the bullets.  She called 911.  Robinson "yelled that they had shot his baby in the head" and "walked out" of the house.  Police and emergency medical personnel arrived a short time later.  Jayshawn was transported to San Joaquin General Hospital and then transferred to Children's Hospital in Oakland.  The chief of surgery explained that, had the fragment not slowed considerably due to the bullet's impact with the car, it would have penetrated "through the spinal cord and through the brain which would have been almost certainly a fatal injury."  The decision was made to clean and dress the wound and allow the fragment to "work itself out on its own."

A few days later, defendant was again seen in the passenger seat of the same car near the Cal Park liquor store.  This time, McKinney was standing next to the store.  As the car drove south down California Street in front of the store, defendant pointed a gun at McKinney, who ran behind a woman.  The car then drove away without shots being fired.

Defendant was arrested on February 9, 2011.  His house was searched the same day.  The SKS rifle was recovered from the living room.  The rifle's magazine contained 26 unfired TulAmmo 7.62 by 39 millimeter rounds.  A single unfired round was in the chamber.  Another round was sitting on the coffee table.  Three shell casings were found elsewhere in the house.  Shell casings of the same brand and caliber recovered from the scene of the shooting were determined to have been fired by defendant's rifle.

In addition to the forensic evidence, the prosecution presented eyewitness testimony from Delbert Rivers.  About an hour before the shooting, Rivers robbed a gas station four blocks from Cal Park.  He then ran to his house a short distance away, got onto his bicycle, and made his way to a house diagonally across the intersection from the liquor store.  Rivers described the shooting recounted above and identified defendant as the shooter.  Rivers was arrested for a string of robberies about a week after defendant was arrested for the shooting.  Several months later, Rivers and defendant were in the same elevator at the San Joaquin County courthouse.  Defendant said, "what's going on" to Rivers, who told defendant not to speak to him and added: "[Y]ou shot that baby and I don't play that kind of stuff, I don't, you know, go like that.  You don't shoot kids."  Defendant responded that "he was trying to shoot [Robinson] and not the child."

*People v. Ivy*, No. C071077, 2014 WL 1327709, at *1-3 (Cal. Ct. App. Apr. 3, 2014).

/////

4

**II.  Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.*  Further, where courts of appeals have diverged in their treatment of

1   an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

2   *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

3        A state court decision is "contrary to" clearly established federal law if it applies a rule

4   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

5   precedent on "materially indistinguishable" facts. *Price  v. Vincent*, 538 U.S. 634, 640 (2003).

6   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

7   writ if the state court identifies the correct governing legal principle from the Supreme Court's

8   decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] *Lockyer v.*

9   *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

10  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

11  court concludes in its independent judgment that the relevant state-court decision applied clearly

12  established federal law erroneously or incorrectly.  Rather, that application must also be

13  unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

14  (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

15  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

16  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

17  'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

18  *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

19  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

20  must show that the state court's ruling on the claim being presented in federal court was so

21  lacking in justification that there was an error well understood and comprehended in existing law

22  beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

23       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

24  court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

25  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

26  _____

27     [1]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

2  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

3  considering de novo the constitutional issues raised.").

4      The court looks to the last reasoned state court decision as the basis for the state court

5  judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If

6  the last reasoned state court decision adopts or substantially incorporates the reasoning from a

7  previous state court decision, this court may consider both decisions to ascertain the reasoning of

8  the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

9  a federal claim has been presented to a state court and the state court has denied relief, it may be

10  presumed that the state court adjudicated the claim on the merits in the absence of any indication

11  or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption

12  may be overcome by a showing "there is reason to think some other explanation for the state

13  court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

14  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

15  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

16  the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

17  S.Ct. 1088, 1091 (2013).

18      Where the state court reaches a decision on the merits but provides no reasoning to

19  support its conclusion, a federal habeas court independently reviews the record to determine

20  whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.

21  Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

22  review of the constitutional issue, but rather, the only method by which we can determine whether

23  a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no

24  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

25  reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

26      A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

28  just what the state court did when it issued a summary denial, the federal court must review the

7

1  state court record to determine whether there was any "reasonable basis for the state court to deny

2  relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

3  have supported, the state court's decision; and then it must ask whether it is possible fairminded

4  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

5  decision of [the Supreme] Court." *Id.* at 102.  The petitioner bears "the burden to demonstrate

6  that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

7  925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

8      When it is clear, however, that a state court has not reached the merits of a petitioner's

9  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

10  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

11  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

12  **III.  Petitioner's Claims**

13      **A.  Sufficiency of the Evidence**

14      In petitioner's first ground for relief, he claims that the evidence is insufficient to support

15  his convictions for the attempted murders of Bretina Moore and her son, Jayshawn.  ECF No. 1 at

16  4.[2]  He argues that the "insubstantial kill zone evidence adduced of Counts Two and Three,

17  attempted murder of Moore and Jayshawn, failed to prove guilt beyond a reasonable doubt."  *Id.*

18      **1.  State Court Decision**

19      The California Court of Appeal denied petitioner's claim of insufficient evidence,

20  reasoning as follows:

21      Defendant contends the evidence is insufficient to support his

22      convictions for the attempted murders of Moore and Jayshawn.
        Specifically, he argues: "At most, the evidence supported a

23      reasonable inference that Robinson . . . was targeted.  But the
        targeting of Robinson cannot be the basis for convicting [defendant]

24      of the attempted murders of Moore and Jayshawn.  There is no
        evidence that [defendant] intended to kill Moore and Jayshawn.

25      Indeed, the evidence indicated that an unseen Jayshawn was
        secreted in the back seat out of the public and [defendant's] view."

26      We are not persuaded.

27  ─────────────

28      [2]  Page number citations such as this one are to the page numbers reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

8

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 572–574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

The mental state required for attempted murder differs from that required for murder. Murder requires malice, express or implied. Express malice, i.e., intent to kill, requires a showing the defendant either desired the death of the victim, or knew to a substantial degree of certainty death would occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Implied malice simply requires a showing the defendant consciously disregarded human life. (*People v. Lasko* (2000) 23 Cal.4th 101, 107.) Attempted murder requires express malice; a conscious disregard for life will not suffice to support a conviction for attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).)

Another difference between murder and attempted murder involves the doctrine of transferred intent. "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder - due to transferred intent - if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland, supra*, 28 Cal.4th at p. 328; *People v. Stone* (2009) 46 Cal.4th 131, 141.)

However, where the defendant intends to kill a specific target and employs a means of attack designed to kill everyone in the vicinity of the target in order to ensure the death of the target, the defendant creates a "kill zone" around the target, and the jury may reasonably infer the defendant possesses the concurrent intent to kill everyone within the kill zone. (*Bland, supra*, 28 Cal.4th at pp. 326–327, 329–330.) "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary

victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his [or her] primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (*Id.* at pp. 330–331, quoting *Ford v. State* (1993) 625 A.2d 984, 1000–1001.)

This case is indistinguishable from *Bland, supra,* 28 Cal.4th 313, in which the defendant and another man, both gang members, fired several rounds into a car driven by a rival gang member. The car also contained two passengers. Convicted of the first degree murder of the driver and the premeditated attempted murders of the passengers, the Court of Appeal reversed the attempted murder convictions. (*Id.* at p. 318.) Our Supreme Court reversed. After adopting the "kill zone" theory of concurrent intent, set forth above, the court explained: "This case permits - virtually compels - a similar inference. Even if the jury found that defendant primarily wanted to kill [the driver] rather than [the] passengers, it could reasonably also have found a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (*Id.* at pp. 330–331.) So too here. While the jury likely concluded defendant's primary target was Robinson, it could reasonably also have found defendant employed a means of attack designed to kill everyone in the car in order to ensure Robinson's death and therefore possessed the concurrent intent to kill everyone within the car. Nor does it matter whether defendant could see that Jayshawn was in the car seat. (*See People v. Adams* (2008) 169 Cal.App.4th 1009, 1022–1023; *see also People v. Vang* (2001) 87 Cal.App.4th 554, 563–564 [where the jury drew a reasonable inference the "defendants harbored a specific intent to kill every living being within the residences they shot up," it did not matter that "they could not see all of their victims"].)

We conclude the evidence is sufficient to support defendant's convictions for the attempted murders of Moore and Jayshawn.

*Ivy*, 2014 WL 1327709, at *3-5.

## 2. Applicable Legal Principles

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a

conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*,___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) ( per curiam ) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). Under *Jackson*, the Court need not find that the conclusion of guilt was compelled, only that it rationally could have been reached. *Drayden v. White*, 232 F.3d 704, 709-10 (9th Cir. 2000). Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Because this case is governed by the AEDPA, this court owes a "double dose of deference" to the decision of the state court. *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v. Belleque*, 659 F.3d 957, 960 (9th Cir. 2011)). *See also Johnson*, 132 S.Ct. at 2062 ("*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."); *Kyzar v. Ryan*, 780 F.3d 940, 943 (9th Cir. 2015) (same).

### 3.  Analysis

After a careful analysis of state law and the facts of this case, the California Court of Appeal concluded that the evidence was sufficient to support petitioner's convictions for the attempted murder of Moore and Jayshawn under the "kill zone" theory of culpability.  This court agrees.  Under California law, petitioner could be found guilty of the attempted murders of Moore and Jayshawn if he employed a means of attack designed to kill everyone in Robinson's vicinity. *People v. Bland*, 28 Cal.4th 313 (2002).  As explained by the Court of Appeal, there was considerable evidence introduced at petitioner's trial that petitioner employed a means of attack designed to kill everyone in Robinson's vehicle in order to accomplish his goal of killing Robinson.  Specifically, he sprayed Robinson's car with bullets during an extensive car chase, causing the rear window to shatter and sending one bullet through the front windshield and another into the dashboard.  Given these facts before the state court, petitioner fails to meet his burden to show that his conviction for the attempted murders of Moore and Jayshawn was outside the range of what a reasonable jury could conclude.   Even if the state court's conclusion that the evidence is sufficient to support petitioner's attempted murder convictions was debatable, AEDPA requires that the state court decision be "objectively unreasonable."  *See Cavazos v. Smith*, ___ U.S. ___, ___, 132 S.Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of evidence challenge simply because the federal court disagrees with the state court.").   Petitioner does not make such a showing.

The California Court of Appeal's rejection of petitioner's claims of insufficient evidence is not clearly erroneous and does not constitute an unreasonable application of *Winship* to the facts of this case.  Certainly the Court of Appeal's decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

/////

/////

/////

**B.  Ineffective Assistance of Counsel**

In his second ground for relief, petitioner claims that his trial counsel rendered ineffective assistance in failing to object to the prosecutor's closing argument and in conceding that there was a "kill zone."  ECF No. 1 at 4.

### 1. <u>State Court Decision</u>

The California Court of Appeal denied these claims, reasoning as follows:

> Defendant also claims his trial counsel rendered constitutionally deficient assistance by (a) failing to object to certain statements made by the prosecutor during closing argument concerning the kill zone theory, and (b) conceding certain points during the defense closing argument.  We disagree.
>
> A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  This right "entitles the defendant not to some bare assistance but rather to effective assistance.  [Citations.]  Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.'  [Citations.]"  (*Ibid.*, quoting *United States v. DeCoster* (D.C.Cir.1973) 487 F.2d 1197, 1202.)  "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."'"  (*In re Harris* (1993) 5 Cal.4th 813, 832–833; *accord, Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)
>
> The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant.  (*People v. Camden* (1976) 16 Cal.3d 808, 816.)  In determining whether counsel's performance was deficient, we must exercise "deferential scrutiny" (*People v. Ledesma, supra*, 43 Cal.3d at p. 216) and refrain from engaging in "the perilous process of second-guessing" counsel's rational tactical decisions.  (*People v. Miller* (1972) 7 Cal.3d 562, 573.)  Where, as here, the record does not contain an explanation for the challenged aspect of representation, the judgment must be affirmed on appeal unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation.  (*People v. Pope* (1979) 23 Cal.3d 412, 425, *overruled on another ground as stated in People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372.)  Thus, we may reverse "'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or

her] act or omission.' [Citation.]"   (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

We turn now to defendant's specific arguments, neither of which has merit.

**A.**

**The Prosecutor's Argument**

During closing argument, the prosecutor made the following statements regarding the kill zone theory:

"Now, we talked about a direct step indicating a definite unambiguous intent to kill, and he did that when he fired that assault rifle, and it's a direct movement towards the commission of a crime.  Now we know his target was [Robinson], but attempted murder also applies when the defendant creates something called a kill zone, and that's what he did here.  The law says a person may intend to kill a specific victim and at the same time intend to kill everyone in a particular harm or kill zone.  The jury instruction on kill zone says this: [']A person, the defendant, may intend to kill a specific victim, [Robinson], and at the same time intend to kill everyone in a particular zone of harm or kill zone.  In order to convict the defendant of the attempted murders of [Moore] and/or Jayshawn, the People must prove that the defendant not only intended to kill [Robinson], but either intended to kill Jayshawn and [Moore], or everyone within the kill zone,['] and his intent was to kill everybody in that car.  He's not specifically targeting [Robinson], he's shooting [Robinson's] car up.  His rounds went straight in through the left driver's side, through the right driver's side.  We know it went through the trunk, through the backseat fragmenting through the car seat, that's a kill zone.

"We know the back window was shot out, the bullet holes went through the very front window.  He's not being discriminatory about who he is trying to shoot, he's trying to shoot everybody in that car, and that's creating a kill zone through the car seat, through the back window, and we know it fragments and ends up there in Jayshawn's head."

Defendant argues his trial counsel provided ineffective assistance by failing to object to these statements because they "misrepresent[ed] and incorrectly inform[ed] the jury on the law" of concurrent intent.   According to defendant, "[t]rying to shoot everybody in the car did not create a kill zone whereby everybody was concurrently targeted to be killed."   He is mistaken.  As we have already explained, from defendant's act of firing at least 11 rounds into the back of Moore's car, the jury could reasonably have concluded he possessed the concurrent intent to kill everyone within the car.  The prosecutor's argument simply stated as much.  Nor is this case like *People v. Anzalone* (2006) 141 Cal.App.4th 380, in which the Court of Appeal held the prosecutor misstated the law by arguing the defendant there could be convicted of four counts of attempted murder based on only two gunshots fired into a

14

crowd simply because all four alleged victims were in "the zone of danger." (*Id.* at pp. 391–393.)   Here, the prosecutor accurately described the kill zone theory and argued it applied to the facts of this case.  Defense counsel appropriately did not object.

## B.

### Defense Counsel's Argument

Defendant also argues his trial counsel provided ineffective assistance by conceding during the defense closing argument that the SKS rifle was "an attempted murder weapon" and a kill zone was created within Moore's car.  With respect to the kill zone theory, defense counsel stated: "The Prosecutor said that the shooter attempted to kill everyone.  He says that the person had the intention to kill everyone . . . within this kill zone, that is, if some people are standing on the sidewalk and a car goes by and does a drive-by and they only want to shoot one person but they actually hit two of them and they don't die, because the kill zone is kind of an attempted murder situation as opposed to a murder thing, so it would not apply to that.  A couple of people are wounded, you don't have to actually attempt to kill everyone, but he thinks that the person attempted to kill everyone.  I think that's probably the right - I think that's probably the right analysis based on the facts of just the physical, the number of shots and the close range and heavy weapon and all those kinds of things like that that there was an intention."

Defendant argues these concessions "for all practical purposes denied [him] his right to have guilt or innocence decided by the jury."  Not so.  In light of the overwhelming evidence the SKS rifle was used in the shooting and a kill zone was created within Moore's car, defense counsel made a reasonable tactical decision to concede these points and argue someone other than defendant was the shooter.   Specifically, in over 70 pages of reporter's transcript, defense counsel urged the jury to believe the testimony of defendant's sister, Brittany Ivy, i.e., that defendant was on a pizza run in a different car with Patrick and another man when the shooting occurred and Colwart had taken her car earlier in the day and did not return until later that night.   Defense counsel also challenged the credibility of Rivers and Patrick, argued the prosecution had not established any motive on defendant's part, and posited whoever committed the crime, likely a member or associate of the Taliban Crips, brought the SKS rifle over to defendant's house sometime after the shooting.  Given the state of the evidence, defense counsel reasonably could have concluded that challenging either the SKS rifle was [sic] used in the crime or Moore's car was turned into a kill zone by the firing of at least 11 rounds into the back of the car would lessen his credibility in the eyes of the jury and the strength of his defense that defendant was not the shooter. (*See People v. Hart* (1999) 20 Cal.4th 546, 631 ["trial counsel reasonably could have concluded that challenging the evidence more vigorously in his argument risked alienating the jury"].)

/////

15

> Defense counsel's performance during his and the prosecutor's closing arguments did not fall below an objective standard of reasonableness.

*Ivy*, 2014 WL 1327709, at \*5-7.

## 2. Applicable Legal Standards

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131 S.Ct. at 789. Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792. A reviewing court "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of

16

1    the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

2    lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

3               **3. <u>Analysis</u>**

4               The California Court of Appeal concluded that petitioner's trial counsel did not render

5    ineffective assistance in conceding the existence of a "kill zone" because his actions were

6    consistent with a reasonable tactical decision to concede this issue in order to bolster his

7    credibility with the jury and focus on the defense theory that petitioner was not the shooter.  This

8    court agrees.  Under *Strickland*, reasonable tactical decisions, including decisions with regard to

9    the presentation of the case, are "virtually unchallengeable."  *Strickland*, 466 U.S. at 687-90.

10   Petitioner has failed to show that his trial counsel's strategy to concede the obvious in order to

11   focus on his defense was outside "the range of competence demanded of attorneys in criminal

12   cases."  *Id.* at 687–88.  Under the circumstances of this case, trial counsel did not render

13   ineffective assistance in failing to object to the prosecutor's closing argument about the "kill

14   zone" and in conceding the issue in his own arguments.  Accordingly, petitioner is not entitled to

15   habeas relief on this claim.

16             **C.  Jury Instruction Error**

17             In his third ground for relief, petitioner claims that the trial court's response to a question

18   from the jury improperly removed an element from the jury's consideration, denied him a fair

19   trial, and "impermissibly coerced the holdout juror to reach a unanimous jury verdict."  ECF No.

20   1 at 5.  The California Court of Appeal explained the background to this claim, and its reasons for

21   denying the claim, as follows:

22             Finally, we reject defendant's assertion the trial court prejudicially
             erred and violated his constitutional rights by telling the jury it
23             could "use the theory and logic of the kill zone in determining
             whether or not [the attempted murders charged in Counts 2 and 3
24             were] willful, deliberate, premeditated."

25             After returning guilty verdicts on all counts, the jury foreperson
             stated the jury was unable to reach a unanimous decision as to the
26             premeditation allegation attached to Counts 2 and 3.  The trial court
             asked: "Does anyone have any questions I might be able to answer
27             that would be of assistance as to that issue?  Anyone have any
             questions you want to ask about that?  [¶]  [Foreperson], do you feel
28             that if you had any additional time that that would be of assistance

17

in being able to reach a verdict?   In other words, is there a reasonable likelihood the jury would be able to reach a verdict as to that issue?"   The foreperson answered:   "It's a possibility, Your Honor."   The trial court then sent the jury home for the day and ordered the jurors to resume their deliberations at 9:00 a.m. the following day.

Shortly after deliberations resumed, the jury sent the trial court two notes.   The first note stated: "Please explain or interpret the definition of the prem[e]ditation, expand with further explanation." The second note stated:  "Please elaborate and expand on 'kill zone' as it applies to willfulness, deliberation and prem[e]ditated."   In response to these notes, the trial court brought the jury into the courtroom and re-read CALCRIM Nos. 600 and 601.

After re-reading CALCRIM No. 601 to the jury, the trial court stated:   "Then the key instruction really is [CALCRIM No.] 601 because the defendant has been found guilty of attempted murder by the jury as to [Moore] and [Jayshawn].  So the remaining issue is whether or not it was willful, deliberate, premeditated.   So [CALCRIM No.] 601 covers that."   As re-read to the jury, CALCRIM No. 601 stated: "If you find the defendant guilty of attempted murder, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation.   [¶]   The defendant acted willfully if he intended to kill when he acted.   [¶] The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  [¶]  The defendant decided to kill - the defendant premeditated if he decided to kill before acting.  [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.   A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated.   On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time.  [¶]  The People have the burden of proving this allegation beyond a reasonable doubt.  If the People have not met this burden, you must find this allegation has not been proved."

The trial court then asked the foreperson:  "So does that answer the question[?]"   The foreperson answered: "Somewhat."   In response to the trial court's solicitation of any further questions, Juror No. 10 asked: "Based on the finding has been that attempted murder and if you use the logic or the scenario of kill zone in that situation [¶] . . . [¶] but then you are struggling with using that same - or can you use that same kill zone scenario for premeditation?   That's the question."   Following a discussion at bench, the trial court answered:  "To answer the question, yes, the jury can use the theory and logic of the kill zone in determining whether or not it was willful, deliberate, premeditated."

18

Defendant argues the trial court abused its discretion by answering this question.  We disagree.  "When a jury asks a question after retiring for deliberation, [Penal Code] '[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.'  [Citation.]  But '[t]his does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.'  [Citation.]  We review for an abuse of discretion any error under [Penal Code] section 1138.  [Citation.]"  (*People v. Eid* (2010) 187 Cal.App.4th 859, 881–882.)  Here, at the time the question was asked, the jury had already found defendant guilty of the attempted murders of Robinson, Moore, and Jayshawn, and further that the attempted murder of Robinson was done willfully and with deliberation and premeditation.  Given the facts of this case, and the content of Juror No. 10's question, it is reasonable to conclude the jury found defendant guilty of the attempted murders of Moore and Jayshawn based on the kill zone theory of concurrent intent, but struggled with whether or not defendant could be found guilty of the willful, deliberate, and premeditated attempted murders of Moore and Jayshawn based on the fact he willfully and with deliberation and premeditation attempted to kill Robinson by employing a means of attack designed to kill everyone in the car, including Moore and Jayshawn.  The answer is "yes."  We conclude this is what the jury would have understood the trial court to mean by "us[ing] the theory and logic of the kill zone in determining whether or not [these attempted murders were] willful, deliberate, premeditated."  The trial court did not abuse its discretion in so instructing the jury.

*Ivy*, 2014 WL 1327709, at *7-8.

In general, a challenge to jury instructions does not state a federal constitutional claim. *McGuire*, 502 U.S. at 72; *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

19

1   Cir. 1984)).  "When a jury makes explicit its difficulties a trial judge should clear them away with

2   concrete accuracy."  *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also Weeks v.*

3   *Angelone*, 528 U.S. 225, 234 (2000).

4        In this case, the trial judge attempted to clear up the jurors' confusion about premeditation

5   and deliberation and how it applied to the "kill zone" theory of culpability by answering their

6   questions with several standard jury instructions and his own response to the question asked by

7   Juror No. 10.  The California Court of Appeal concluded that the trial judge's response to the

8   question asked by Juror No. 10 was correct under California law, and there is no dispute that the

9   standard jury instructions were also correct.  After the jurors received accurate direction from the

10  trial court, they asked no further questions and were able to reach a unanimous verdict.  This

11  indicates that they were satisfied with the court's answer and that it cleared up their confusion.

12  There is no evidence that the judge's response to the specific question asked by Juror No. 10 was

13  incorrect, coerced a guilty verdict, or otherwise rendered petitioner's trial fundamentally unfair.

14       Under these circumstances, petitioner has failed to show that the trial court violated

15  petitioner's right to due process in responding to the jury's questions about the concept of

16  "premeditation and deliberation" and how it applied to the "kill zone" theory of culpability.  The

17  decision of the California Court of Appeal to the same effect is not contrary to, or an

18  unreasonable application of United States Supreme Court authority.  Accordingly, petitioner is

19  not entitled to relief on his jury instruction claim.

20  **IV. Conclusion**

21       For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

22  application for a writ of habeas corpus be denied.

23       These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

27  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

28  shall be served and filed within fourteen days after service of the objections.  Failure to file

objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  July 25, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

21